WO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Tanya Feild, | No. CV-12-00330-TUC-BPV |
| Plaintiff, | **ORDER** |
| v. | |
| Carolyn W. Colvin, Acting Commissioner of Social Security, | |
| Defendant. | |

Plaintiff, Tanya Feild, filed this action for review of the final decision of the Commissioner of Social Security pursuant to 42 U.S.C. § 405(g).  The United States Magistrate Judge presides over this case pursuant to 28 U.S.C. § 636 (c) and Fed.R.Civ.P. 73, having received the written consent of both parties.

I.    **PROCEDURAL HISTORY**

Plaintiff filed an application for Disability Insurance Benefits ("DIB") on September 21, 2009, alleging an onset of disability beginning January 16, 2007 due to irritable bowel syndrome, fibromyalgia, migraines, vertigo, and severe fatigue. Transcript/Administrative Record ("Tr.") 114-15, 127-135. The application was denied initially and on reconsideration. Tr. 69-83, 93-96, 98-100. A hearing before an Administrative Law Judge ("ALJ") was held on March 16, 2011. Tr. 29-47. At the time

of hearing, Plaintiff's attorney amended the date of onset of disability to November 1, 2008. Tr. 36. The ALJ issued a decision on April 5, 2011, finding Plaintiff not disabled within the meaning of the Social Security Act. Tr. 15-24. This decision became the Commissioner's final decision when the Appeals Council denied review. Tr. 1-3.

Plaintiff then commenced this action for judicial review pursuant to 42 U.S.C. § 405(g). (Doc. 1) After considering the record before the Court and the parties' briefing of the issues, the Court will reverse Defendant's decision and remand for further proceedings.

**II.    THE RECORD ON APPEAL**

    A.  Plaintiff's Background and Statements in the Record

Plaintiff was 52 years old at the time of the ALJ's decision with a high school degree, special training in cosmetology, and past relevant work as a hair stylist.  Tr. 24, 114, 129, 133.

Plaintiff completed a questionnaire in relation to her Social Security application in September, 2009. Plaintiff reported:

> The fibromyalgia is a migrating pain but worse is the loss of memory and not being able to think clearly. Also my ability to think a situation thru [sic] or find the correct words I want to say. Math is extremely difficult as is reading. When I do something too long I become "ill". I need to be able to lie down or just sleep. Sometimes it takes several days to feel normal. My balance is impaired sometimes so severely that I fall making simple tasks impossible. Irritable bowel syndrome is unpredictable and need to be close to a bathroom when it happens. My meds cause lots of gas.

Tr. 128. Plaintiff noted that she was unable, or only sometimes able to do all activities of daily living. Tr. 161-62.

Plaintiff testified at her hearing before the ALJ on March 16, 2011, that she left her cosmetology job because she was "getting sick, and having vertigo problems." Tr. 37. She states she was having migraines and having "like a flu feeling constantly. Everything ached, and I was nauseous, or I was dizzy. And I'd end up calling in several times a week, and I just couldn't keep up with the work anymore." Tr. 37. Plaintiff testified that it was being tired, and "exhausted all the time. The vertigo and the migraines" that kept her from working at the time of the hearing, that the aches and pains were "kind of minor to all of that stuff." Tr. 40. Plaintiff gets migraines a couple times a week or more, and has to go to bed, sometimes for a few hours, sometimes for a day or two. Tr. 44-46. Plaintiff testified that she makes her husband lunch for work each day, then afterwards goes back to bed. Tr. 42. When she wakes up later, she eats cereal, takes her medicine, then waters her plants, then sits or lies down for a bit. Tr. 43. She doesn't vacuum very frequently, but will cook an evening meal if she feels good, and takes care of her laundry. Tr. 43-44. Plaintiff's husband takes her shopping, she gets together with friends occasionally, and she tries to go to church every week. Tr. 44.

B. Medical Evidence Before the ALJ

1) Treating Physicians

Plaintiff was examined and treated by Stuart Snider, M.D., on February 27, 2006, for complaints of three vertiginous episodes during the previous 16 months. Tr. 277. Dr. Snider opined that Plaintiffs presentation with brief nystagmus and nystagmus plus nausea suggested a peripheral rather than brainstem or central origin for the symptoms,

and while a viral labyrinthitis recurrence was possible, was somewhat more in favor of atypical (vertiginous) migraine or Meniere's disease. Tr. 277. Dr. Snider also considered another possibility of externally precipitated disease, for example environmental or infectious, perhaps combined with beginning menopause, considering Plaintiff's exposure to organic fumes as a cosmetology instructor. Tr. 277

On June 20, 2006, Dr. Snider reported that Plaintiff's successful trial of Maxalt for the vertigo episodes established the vertiginous migraine mechanism. Tr. 276. Plaintiff also reported symptoms of a hand tremor during that visit, which Dr. Snider assessed as an exaggerated essential tremor. Tr. 276. Though there was no discussion in this progress note of symptoms or assessment of depression, Dr. Snider noted he would continue Plaintiff on anti-depressant medication for depression, and prescribed additional medication for tremor suppression. Tr. 276.

On February 12, 2007, Plaintiff was seen by Dr. Snider for worsening of dizziness, slightly worse tremor, and stable headaches. Tr. 275. Additionally, Plaintiff reported trouble with attention and difficulty remembering. Tr. 275. Dr. Snider assessed anxiety as the possible basis of these symptoms, with a small (10%) chance of systemic disease such as impaired glucose tolerance or, less likely, demyelinating disease. Tr. 275. Dr. Snider recommended a repeat MRI scan of the head, tapering Plaintiff's medication to try to reduce the tremor, and ordered additional lab tests. Tr. 275.

On March 6, 2007, Plaintiff returned to Dr. Snider. Dr. Snider reported a normal MRI scan of the brain, a normal glucose tolerance test, normal blood pressure, and no

neurologic abnormalities apart from a positive hyperventilation test for dizziness. Tr. 274. Dr. Snider could only make a primary neurologic diagnosis of migraine. Tr. 274.

Plaintiff was examined by Berchman A. Vaz, M.D., on July 11, 2007. Dr. Vaz noted mild Bouchard and Heberden nodes in the small joints of her hands, no obvious synovitis in any other peripheral joins, mild tenderness with movement of the back, and no significant fibromyalgic tender points on examination. Tr. 273. Dr. Vaz concluded that there was not much evidence to suggest a diagnosis of fibromyalgia or an inflammatory arthritis, but the findings were suggestive of early osteoarthritis. Tr. 273.

Plaintiff was examined and treated by Bridget Walsh, D.O., with Catalina Pointe Arthritis and Rheumatology Specialists, on November 6, 2007, for complaints of pain, stiffness, and dizziness, subsequent to a referral for an evaluation at the request of Plaintiff's treating provider, physician assistant Nance (*see* P.A. Nance's treatment notes, *infra*, Section B.4). Tr. 224. Dr. Walsh assessed Plaintiff with fibromyalgia, essential tremor, joint pain, and irritable bowel syndrome. Tr. 225. Dr. Walsh opined that "[o]verall I agree [with] the diagnosis of fibromyalgia." Tr. 225.

### 2) Examining State Agency Physicians

On February 18, 2009, John T. Beck, Ph.D., conducted a neuropsychological evaluation of Plaintiff and review of her current treatment records to determine her current level of cognitive functioning and return to work status. Tr. 369-73. Dr. Beck noted no indication during testing that Plaintiff was not fully cooperating or putting forth her best effort, and was adequately motivated during testing. Tr. 372. Dr. Beck reported

the scores from testing should be considered valid. Tr. 372. Dr. Beck reported the findings were consistent with those of Dr. Rastatter, discussed *infra*, Section II.B.4, including mild to moderate deficits in higher cortical function with significant impairments in abstract reasoning, judgment, insight, memory, planning ability, organizational skills, and skills requiring concentration and attention. Tr. 372. Dr. Beck reported significant signs of attentional deficits. Tr. 372. Measures of registration, short-term storage, consolidation, long-term storage, retrieval and forgetting all were outside normal limits, on an age-corrected basis. Tr. 372. Significant indications for frontal lobe dysfunction were noted. Tr. 372. Examination of abilities to abstract, generalize, mental flexibility, reasoning and judgment showed performance all outside of normal limits. Tr. 373. Measures of goal formulation, planning, carrying out activities, and effective performance, as demonstrated by both objective testing and ecological evaluation shown in the examinee's environmental interactions with others, appeared to confirm the existence of abnormal execution of frontal lobe function. Tr. 373. Dr. Beck's diagnostic impressions and conclusions were that Plaintiff's behavior, in her interactions, were not normal, despite trying very hard, and that she demonstrated a clear loss of neuro-cognitive efficiency, coupled with significant pain guarding behavior. Tr. 373. Dr. Beck opined:

> In answer to the questions posed to me by this referral, it is my professional opinion, to a reasonable degree of neuropsychological probability that:
>
> On neuropsychological exam, the examinee demonstrated objective mild to moderate deficits in diffuse brain function.

It is important to note that there was no objective or subjective indication of poor cooperation or lack of effort.

The examinee clearly seems unable to return to work at this juncture. Limitations would include any type of new learning, difficulty with sustained concentration and attention, problems with planning and thinking.

Tr. 373.

On December 8, 2009, Jeri B. Hassman, M.D., an independent medical examiner, conducted a physical examination of Plaintiff in relation to her claim for Social Security disability benefits. Tr. 285-88. Dr. Hassman also reviewed Plaintiff's medical records. Tr. 286. Dr. Hassman diagnosed Plaintiff with a history of migraine headaches; history of irritable bowel syndrome and mild abdominal tenderness; fibromyalgia, noting she does have complaints of problems sleeping and diffuse, aching muscular pain, and a negative workup for any inflammatory arthritis or inflammatory condition; previous problems with vertigo, now not a problem; previous problems with tremor, according to medical records, but no tremor on exam today. Tr. 288.

Dr. Hassman completed a Medical Source Statement of Ability to do Work-Related Activities (Physical), noting Plaintiff would have limitations lasting 12 months, due to the above diagnoses. Tr. 289. Dr. Hassman noted the following restrictions: lifting and carrying occasionally 20 pounds, and frequently 10 pounds; standing or walking 6-8 hours in an 8 hour day; sitting 6-8 hours in an 8 hour day with the ability to change positions at least every hour for 5-10 minutes because of muscular pain and muscular stiffness, occasional climbing, stooping, and kneeling, no ladders, ropes, scaffolds, or crawling; and no working around heights, or extremes in temperatures. Tr. 289-91.

On December 22, 2009, Ralph H. Wetmore, II, Ph.D., conducted a psychiatric consultation of Plaintiff in relation to her claim for Social Security disability benefits. Tr. 302-05. Dr. Wetmore also reviewed the Plaintiff's medical records including Plaintiff's Function Report – Adult; Psychological Survey; and Beck Depression Inventory. Tr. 302. Dr. Wetmore concluded that Plaintiff has the ability to understand and remember instructions, locations and work-like procedures. Tr. 304. Dr. Wetmore deferred Axis I and II diagnoses. Tr. 304.

### 3) Non-examining State Agency Physicians

On December 15, 2009, Stephen S. Dickstein, medical consultant, completed a physical residual functional capacity assessment. Tr. 293-300. Mr. Dickstein found the following limitations: lifting and carrying occasionally 20 pounds, and frequently 10 pounds; standing or walking 6-8 hours in an 8 hour day; and sitting 6-8 hours in an 8 hour day; occasional crouching and crawling; no ladder, ropes or scaffolds; avoidance of concentrated exposure to extreme cold, and avoidance of moderate exposure to hazards. Tr. 294-97. Mr. Dickstein found Plaintiff only partially credible, reporting that her stated symptoms and limitations are not fully supported by the objective somatic findings. Tr. 298.

Andres Kerns, Ph.D., completed a Psychiatric Review Technique form on December 24, 2009 finding no medically determinable impairment. Tr. 306. Dr. Kerns reported that the consulting examiner found relatively robust activities of daily living, a

mini mental status exam of 29 out of 30, and no compelling evidence of a mood disorder or memory loss, and declined to provide an Axis I or Axis II diagnosis. Tr. 318.

### 4)  Other Sources

Plaintiff was examined and treated by Katy Nance, P.A., on February 14, 2006, for complaints of vertigo, ataxia, tinnitus, and fatigue. Nance assessed vertigo, and questioned vestibular neuritis, and prescribed Prednisone, and referred Plaintiff for a neurological consult, and a physical therapist for balance training. Tr. 268.

Plaintiff reported complaints of shaking in her arms and head on June 6, 2006. Plaintiff reported that Maxalt medication worked well for her migraines. Nance observed a head tremor, and tremor in both arms and assessed Plaintiff with tremors, migraines, insomnia, and depression. Nance prescribed propranolol, Maxalt, and Celexa, and referred Plaintiff to Dr. Schneider for a diagnosis confirmation. Tr. 267.

On August 25, 2006, Plaintiff complained of lower back pain, radiating into her lower pelvis, and down her legs. Nance referred Plaintiff to the emergency room where she was diagnosed with a ruptured ovarian cyst. Tr. 265.

On January 11, 2007, Plaintiff reported extreme stress, exhaustion, frequent flare-up of migraines, frequent crying, forgetfulness, with anxiety attacks. Nance assessed Plaintiff with migraines, mild memory loss, essential tremor and stress reaction, and recommended a four week absence from work and continuation of her medications. Tr. 264.

On February 6, 2007, Plaintiff reported continued dizziness and migraines, loss of balance, memory loss, right sided abdominal pain, excessive flatulence, diarrhea and constipation, mild heartburn, with improved tremors since being off work unless she is very tired. Nance assessed Plaintiff with dizziness, migraines, memory loss, tenia, irritable bowel syndrome, ovarian cyst, abdominal bloating, tremors, and stress, and continued Plaintiff on Maxalt, Proventil for asthma, referred Plaintiff to Dr. Snider for further medication as her symptoms were progressing neurologically. Tr. 263.

On March 6, 2007, Plaintiff followed up with Nance for migraines, fatigue and stress. Plaintiff reported that her symptoms get worse with exertion, if she does too much, or if it is cloudy outside; she gets dizzy and nauseated every day. Plaintiff reported she no longer drives, does not teach Sunday school anymore, and cannot go to work. Nance assessed Plaintiff with dizziness, migraines, exhaustion, tremors and stress, and prescribed a trial of lorazepam as directed by Dr. Snider, blood test, and work discontinuation. Tr. 262.

On March 15, 2007, Plaintiff followed up with Nance for her lab results, and reported complaints of insomnia. Nance prescribed trazadone for insomnia, ordered a 24-hour urine heavy metal screen, and discussed the use of further anti-depressants. Tr. 261.

On March 29, 2007, Plaintiff reported insomnia, dizziness, migraines and exhaustion. Plaintiff reported that the trazadone for insomnia was not helpful. Nance recommended increasing the dosage, considered Topamax for her migraines, as she reported having 2-3 per week, and recommended that she be on disability. Tr. 260.

On April 23, 2007, Plaintiff reported still having symptoms of dizziness, migraines, and fatigue, and was still exhausted. Her tremors were stable. Nance started Plaintiff on Topamax. Tr. 259.

On May 10, 2007, Plaintiff reported that she has good days, and bad days, and cannot do more than two hours of activity at home before she is exhausted for the rest of the day and has to go to bed. She also reported difficulty driving due to dizziness, and that any kind of work aggravates her muscle aches. Plaintiff discontinued Topamax because it increased her dizziness and made her physically ill. Nance assessed Plaintiff with probable fibromyalgia, and recommended no work for six months, as she was barely able to maintain activities of daily living. Nance referred Plaintiff to a rheumatologist to confirm diagnosis of fibromyalgia. Plaintiff was continued on Maxalt and Demerol as needed, and continued Plaintiff on trazodone for insomnia. Tr. 258.

On July 9, 2007, Plaintiff reported some good days, but a lot of bad days, feeling "icky in her head all day" and exhausted. Nance assessed probable fibromyalgia, and recommended follow up after a rheumatologist evaluation. Tr. 257.

On August 6, 2007, Plaintiff was treated for a sinus infection, but also reported pelvic pain, exhaustion, muscle aches and joint pains. Plaintiff also complained of not sleeping well, irritable bowel syndrome, alternating constipation and diarrhea, and frequent cold sores. Plaintiff was positive for 12 trigger point spots, with the pain lasting even after the pressure was removed. Nance referred Plaintiff for a pelvic ultrasound, and prescribed Lyrica, and ordered blood tests. Tr. 256.

On August 27, 2007, returned to Nance for a medication follow up. Plaintiff reported a decrease in pain from a 6 to a 2/10. She reported more vertigo and head fuzziness. Nance continued Plaintiff on the same dosage of Lyrica and recommended home exercises for vertigo. Tr. 255.

On November 14, 2007, Plaintiff underwent a psycho-social assessment performed by Charles J. Rastatter, Ed.D., Director, Vocational Assessment. Tr. 229-236. The purpose of the assessment was to determine Plaintiff's capacity to return to productive employment in the competitive labor market. Tr. 229. Dr. Rastatter concluded that Plaintiff had multiple primary employment barriers that were directly related to her medical problems and their multiple, residual symptoms, and that, until the barriers were resolved, or significantly reduced in intensity from their current level, Plaintiff would be unable to perform successfully in any job in the competitive labor market on a regular, prolonged basis. Tr. 235-36. Dr. Rastatter noted Plaintiff's barriers included the following:

Physical
- very significant problems related to sustaining physical performance and physical demands activities over time as would be required in work situations;
- necessity for frequent rest periods to accommodate pain, fatigue, and exhaustion related to even minimally repetitive, prolonged upper and lower physical activities;
- necessity for frequent absences on days when unable to perform even minimal work tasks;
- necessity for frequent restroom breaks;
- significant job modifications required to accommodate symptoms related diagnosed conditions, including vertigo;

Cognitive
- significant problems in the areas of memory, sustaining concentration-focus, retaining/processing information, decision making, increased errors related to performing prolonged cognitive activities.

Tr. 235-36.

On February 28, 2008, Plaintiff reported lower back pain and bilateral hip pain, for the previous 6-8 months. Nance observed tenderness over L5, S1 and in both SI joints, and both "glutes." Lower back range of motion was decreased due to pain. Nance noted that she had been diagnosed by Dr. Walsh with fibromyalgia and was currently in a clinical medication study for treatment. Tr. 253.

On May 12, 2009, P. A. Hoeft[1], reported that Plaintiff was on a study medication called Savella, which was helping most of Plaintiff's "brain foggy" days, but that Plaintiff still had aches and pains. Hoeft agreed with the disability application, and recommended follow up in 6 months or sooner if needed. Tr. 252.

On August 21, 2009, Plaintiff reported to Hoeft with a lot of pain, headaches and fatigues for three weeks. She had fallen twice recently, and had eyelid twitching on the right side, and red spots on her face. Plaintiff reported trying to swim 2-3 times per week. Hoeft observed 2 areas of broken blood vessels on her cheeks. Hoeft recommended a trial of Flexeril at bedtime, and to continue with the exercise. Tr. 251.

On August 31, 2009, Plaintiff reported no change. Tr. 250. Hoeft recommended that Plaintiff discontinue the Flexeril, and try Robaxin, and consider trying amitriptyline if that did not help her sleep or her muscle aches. Tr. 250.

---

[1] Plaintiff's treating provider's last name on this date of treatment and hereafter is Hoeft, but is presumably the same P.A. that has treated Plaintiff beginning in 2006.

On February 5, 2010, Plaintiff reported that the Maxalt was not working on her migraines, that she felt that she was no longer being treated with Savella in the clinical study, that she believed she was on the placebo, and had been in more pain since they switched her medications in the study. Tr. 330.

On April 26, 2010, Plaintiff presented with hypertension, and reported that she hurts more in her muscles since being off the Savella, and that Maxalt makes her feel drugged up and made her neck feel constricted. Hoeft assessed Plaintiff with essential hypertension, migraine and hypertension, and prescribed Treximet for migraines. Tr. 348-49.

Hoeft completed a Physical Residual Capacity Assessment on January 7, 2011. Hoeft found the following limitations: lifting and carrying 10 pounds occasionally; standing 2 hours or less during an 8 hour day with 3 formal breaks; sitting 15-30 minutes at one time without needing to change position; and walking 2 blocks at one time before needing to stop; a requirement to alternate sitting and standing every hour; occasional reaching, feeling, fingering, handling, and grasping; requirement of lying down after activity or stress; and missing more than five days a month of work due to physical conditions. Hoeft noted that she had observed Plaintiff for several years, that Plaintiff gets episodic severe fatigue, dizziness, and cognitive impairment when she is too active, and that Hoeft's report was based on subjective and objective findings. Tr. 368.

   *5)  The ALJ's Findings*

The ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged onset date of November 1, 2008. Tr. 20, ¶ 2. The ALJ found that Plaintiff has multiple severe impairments: migraine and fibromyalgia. Tr. 20, ¶ 3. The ALJ found that these impairments do not meet or equal a listed impairment. Tr. 21, ¶ 4. At step four, the ALJ found that Plaintiff had the RFC to perform the full range of light work, with restrictions from climbing ladders, ropes and scaffolds, and crouching and crawling; limitations of occasional climbing ramps and stairs, stooping and kneeling; restrictions from balancing; and avoidance of even moderate exposure to working unprotected heights around temperature extremes.  Tr. 21, ¶ 5. The ALJ found no mental impairment. The ALJ found that Plaintiff was capable of performing her past relevant work as a hair stylist, and thus, the ALJ concluded that Plaintiff is not disabled. Tr. 24, ¶¶ 6-7.

### 6)  *Additional Evidence Submitted to the Appeals Council*

After the ALJ's April 5, 2011 decision, Plaintiff completed and submitted additional evidence in the form of a headache questionnaire to the Appeals Council. Tr. Tr. 202-205. The Appeals Council found that the additional evidence did not provide a basis for changing the ALJ's decision. Tr. 1-5.

## III.   DISCUSSION

### A. Argument

Plaintiff raises three points of error. Plaintiff contends that the ALJ erred by 1) failing to properly rate the severity of Plaintiff's mental impairments; 2) by making an adverse credibility finding; and 3) by finding that the Plaintiff could perform her past relevant work without benefit of vocational expert testimony and without reference to the Dictionary of Occupational Titles. (Doc. 24). The Commissioner contends that the ALJ's decision is supported by substantial evidence and if free of harmful legal error. (Doc. 37).

B.  <u>Standard of Review</u>

The Court has the "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The Commissioner's decision to deny benefits "should be upheld unless it is based on legal error or is not supported by substantial evidence." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008). In determining whether the decision is supported by substantial evidence, the Court "must consider the entire record as a whole and may not affirm simply by isolating a 'specific quantum of supporting evidence.'" *Id*.

Whether a claimant is disabled is determined using a five-step evaluation process. To establish disability, the claimant must show (1) she has not worked since the alleged disability onset date, (2) she has a severe impairment, and (3) her impairment meets or equals a listed impairment or (4) her residual functional capacity (RFC) precludes her from performing her past work. At step five, the Commissioner must show that the claimant is able to perform other work. *See* 20 C.F.R. §§ 416.920(a)-(g).

- 16 -

1

2

C. Analysis

3

1) *Step Two Finding*

4

Plaintiff argues that the ALJ erred in failing to properly rate the severity of the

5

Plaintiff's mental impairments. The Commissioner argues that any error at step two is

6

harmless because the ALJ did not conclude the analysis at step two, but proceeded

7

8

through the remaining steps of the sequential evaluation process.

9

The step-two inquiry is a *de minimis* screening device to dispose of groundless

10

claims. *Webb v. Barnhart*, 433 F.3d 683, 687 (9th Cir. 2005) (citing SSR 85-28); *Bowen*

11

*v. Yuckert*, 482 U.S. 137, 153 (1987). "The regulations guiding the step-two

12

determination of whether a disability is severe is merely a threshold determination of

13

whether the claimant is able to perform his past work. Thus, a finding that a claimant is

14

severe at step two only raises a prima facie case of a disability." *Hoopai v. Astrue*, 499

15

16

F.3d 1071, 1075 (9th Cir. 2007). Error in a step two determination that some impairments

17

are nonsevere is harmless when the ALJ determines that other impairments are severe

18

19

and proceeds through the sequential evaluation considering the allegations of functional

20

limitations imposed by non-severe impairments. *See Gray v. Comm'r of Soc. Sec. Admin.*,

21

22

365 Fed Appx 60, 61 (9th Cir. 2010) (rejecting argument that the ALJ erred at step two by

23

determining certain impairments were nonsevere, because any alleged error was harmless

24

since "the ALJ concluded that [claimant's] other medical problems were severe

25

26

impairments"); *see also Mondragon v. Astrue*, 364 Fed.Appx. 346, 348 (9th Cir. 2010)

27

28

(unreported case) "Any alleged error at step two was harmless because step two was decided in [claimant]'s favor with regard to other ailments.").

The Court finds, however, that the ALJ committed harmful legal error by giving Dr. Beck's opinion no weight at step two, and consequently, at step four the ALJ further failed to consider Dr. Beck's opinion in establishing Plaintiff's nonexertional limitations and failed to take Plaintiff's mental impairments into account, resulting in an RFC determination that was not supported by substantial evidence.

At step two, the ALJ gave Dr. Beck's medical conclusions and opinions "no controlling weight" stating that Dr. Beck's opinion "is general and conclusory, and the doctor had no treating relationship with the claimant. (20 CFR 404.1527(e), Social Security Ruling 96-5p)" Tr. 20. While the opinion of any physician, including a treating physician, need not be accepted, "if that opinion is brief, conclusory, and inadequately supported by clinical findings", *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1228 (9th Cir. 2009), the ALJ may only reject an examining physician's contradicted medical opinion for specific and legitimate reasons that are supported by substantial evidence in the record. *Carmickle v. Comm'r of Soc. Sec. Admin*, 533 F.3d 1155, 1164 (9th Cir. 2008). The record does not support the ALJ's determination that Dr. Beck's opinion is general and conclusory. Dr. Beck reported that he performed 14 different psychological tests on Plaintiff, including validity testing, and a mental status exam, a writing sample, a clinical interview, and a medical records review. Tr. 369-373. Dr. Beck summarized the results including categories of "Behavorial Observations," "Test Validity," "Test Results" (these

included a comparison of results with Dr. Rastatter's testing), "Attentional Functions," "Memory and Learning," and "Conceptual Activities & Executive Functions," and "Diagnostic Impressions/Conclusion." (Tr. 371-73). Dr. Beck also answered directly and specifically the referral question put to him regarding Plaintiff's level of cognitive functioning. Tr. 370-373. Dr. Beck's opinion is not general and conclusory. Additionally, Dr. Beck's opinions are consistent with those of Dr. Rastatter, provided on November 14, 2007.

Furthermore, while a lack of treating relationship with a claimant is one factor the ALJ may consider in weighing medical opinions, *see* 20 C.F.R. 404.1527(c)(2) (noting that a treating physician's opinion is entitled to controlling weight if it is well-supported and not inconsistent with other substantial evidence); opinions from nontreating sources are weighed based on the examining relationship (or lack thereof), supportability, consistency, specialization, and other factors. The ALJ's explicit decision to give Dr. Beck's opinion no controlling weight, and implicit decision to disregard Dr. Beck's opinion in its entirety, based on the fact that Dr. Beck had no treating relationship with Plaintiff, was not only legal error under the Commissioner's own regulations, but transparently disingenuous when the ALJ, in the very next sentence in the ruling after rejecting Dr. Beck's opinion, adopted the opinion of the state agency's consultative nontreating examiner. Although the error was harmless at step two, it became prejudicial at step four because the ALJ, having found at step two that "claimant's alleged mental impairment does not cause more than minimal limitations in the claimant's ability to

perform basic mental work activities" disregarded Dr. Beck's opinion in establishing the nonexertional limitations of Plaintiff's RFC.

The Commissioner concedes that Dr. Beck was an acceptable medical source, but asserts that "nowhere in his opinion did he diagnose Plaintiff with anxiety disorder (or with any other mental impairment) (Tr. 369-373)." The Commissioner acknowledges that Dr. Beck observed Plaintiff's behavior, test results, and diagnostic impressions, and that his impressions and conclusions indicated Plaintiff's functional limitations (Doc. 37, at 10), but asserts that "[w]ithout an opinion from Dr. Beck – or any other acceptable medical source – about what impairment he believed caused these functional limitations (i.e., a diagnosis), it would have been error for the ALJ to have included a mental impairment at step two." The Commissioner is incorrect, Drs. Beck, Wetmore, and Walsh each concluded that Plaintiff carried a diagnosis of fibromyalgia. As the agency's rules state "[p]eople with [fibromyalgia] may also have nonexertional physical or mental limitations because of their pain or other symptoms." SSR 12-2p. Specifically, one of the three diagnostic criteria for establishing that a claimant has the medically determinable impairment of fibromyalgia is "[r]epeated manifestations of six or more [fibromyalgia] symptoms, signs, or co-occuring conditions, especially manifestations of fatigue, *cognitive or memory problems* ("fibro fog"), waking unrefreshed, depression, anxiety disorder, or irritable bowel syndrome… ." *Id.* (emphasis added, internal footnotes omitted). The Commissioner fails to consider that Plaintiff's cognitive deficits are, as the agency's ruling suggests, manifestations of and, in fact, diagnostic indicators of,

Plaintiff's medically determinable impairment of fibromyalgia. Additionally, the ALJ did not rely on this rationale in his opinion as a basis for rejecting Dr. Beck's opinion. This Court should review only the reasons provided by the ALJ in the disability determination and may not affirm the ALJ on a ground upon which he did not rely. *See Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007)(citing *Connett v. Barnhart*, 340 F.3d 871, 874 (9th Cir. 2003)); *Pinto v. Massanari*, 249 F.3d 840, 847-48 (9th Cir. 2001) (the district court may not affirm the ALJ's decision "on a ground that the agency did not invoke in making its decision[.]"); *Accord Varney v. Sec'y Health & Human Serv.*, 859 F.2d 1396, 1399 (9th Cir. 1988) ("there may exist valid grounds on which to discredit a claimant's pain testimony.... But if grounds for such a finding exist, it is both reasonable and desirable to require the ALJ to articulate them in the original decision.") (internal quotes and citation omitted). For these reasons, the Court finds that it was error for the ALJ to reject the medical opinion of Dr. Beck regarding the functional limitations caused by Plaintiff's cognitive deficits and Plaintiff's level of cognitive functioning.

### 2)  Credibility Determination

Plaintiff argues that the ALJ's misunderstanding of fibromyalgia syndrome, and focus on the lack of objective medical evidence in the record, led to an adverse credibility determination based on an improper assessment of the evidence. (Doc. 24, at 11). The Commissioner argues that the ALJ reasonably considered a series of inconsistencies between Plaintiff's statements and the other evidence of record in finding her less than

credible, and reasonably found that Plaintiff's complaints of disabling limitations were not supported by the objective medical evidence. (Doc. 37, at 12-13).

Plaintiff has produced objective medical evidence of an underlying impairment that could reasonably give rise to her symptoms. Moreover, there has not been an affirmative finding of malingering by the ALJ. The ALJ's reasons for rejecting Plaintiff's testimony, therefore, must be clear and convincing. *Orn,* 495 F.3d at 635. "The ALJ must state specifically which symptom testimony is not credible and what facts in the record lead to that conclusion." *Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996). In evaluating the credibility of a claimant's testimony regarding subjective pain or other symptoms, the ALJ is required to engage in a two-step analysis: (1) determine whether the claimant presented objective medical evidence of an impairment that could reasonably be expected to produce some degree of the pain or other symptoms alleged; and, if so, with no evidence of malingering, (2) reject the claimant's testimony about the severity of the symptoms only by giving specific, clear, and convincing reasons for the rejection. *See Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009).[2] To support a lack of credibility finding, the ALJ is required to point to specific facts in the record that demonstrate that Plaintiff's symptoms are less severe than she claims. *Id*. at 592. "Factors

---

[2] Contrary to the Commissioner's contention, *Bunnell v. Sullivan*, 947 F.2d 341 (9th Cir. 1991), does not permit finding subjective symptom testimony not credible without articulating clear and convincing reasons. The Commissioner correctly quotes *Bunnell* as stating an ALJ must make specific findings, supported by the record, to support his conclusion that a claimant's allegations of severity are not credible. *See id*. at 345. But *Bunnell* does not address whether the reasons must be clear and convincing. Rather, it addresses whether an ALJ may discredit a claimant's allegations of the severity of pain solely on the ground that the allegations are unsupported by objective medical evidence.

that an ALJ may consider in weighing a claimant's credibility include reputation for truthfulness, inconsistencies in testimony or between testimony and conduct, daily activities, and unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment." *Orn*, 495 F.3d at 636 (internal quotation marks and citations omitted).

The ALJ found that Plaintiff received only modest treatment for the impairments of fibromyalgia and migraine headaches. Tr. 22. The ALJ noted that, in November 2007, Plaintiff was placed on a study medication, Savella, then later on a trial of Flexeril, which was later changed to a trial of Robaxin for "muscle aches." Tr. 22. The ALJ commented that in May, 2010, Plaintiff was no longer taking medication for migraine headaches "because she has not had a migraine." Tr. 23. The ALJ also noted that when Nance recommended that Plaintiff continue her exercise program, Plaintiff tried to swim 2-3 times per week, "which suggests that she remains active" and that in May, 2010, Plaintiff reported exercising "a lot" but with no loss of weight. Tr. 23. The ALJ also noted that, in August 2010, Hoeft noted that Plaintiff's fibromyalgia was "stable" with a normal physical examination. Tr. 23.

It is unclear why the ALJ concluded that Plaintiff's medical treatment was "modest" because the ALJ does not explain the basis for this *ad hoc* categorization; thus the ALJ's reasoning is neither clear nor convincing. Because fibromyalgia is a disease that has eluded the medical community both in terms of a cause and a cure, there is no support for the ALJ's implicit conclusion that a more severe and disabling condition

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

would necessarily result in more aggressive treatment. *See Benecke v. Barnhart*, 379 F.3d 587, 590 (9th Cir. 2004). Additionally, in discussing Plaintiff's "modest" treatment, the ALJ takes treatment notes out of context, quotes partial statements from treatment notes resulting in a change in the meaning of the treatment notes, and fails to consider Plaintiff's treatment as a whole. For example, the ALJ stated that Hoeft noted that Plaintiff's condition was "stable" in August 2010 (Tr. 22); Hoeft's treatment note actually reads: "stable, but still hurting. … Has brain fog. She keeps up her activity level anyway." Tr. 355. As for Plaintiff's migraines, although the ALJ stated that Plaintiff no longer took medication for migraines in May 2010, Plaintiff was diagnosed and treated for migraines as early as June 2006 throughout April 2010 (Tr. 267, 330, 348-49), a period of nearly four years, and reported discontinuation of medication due to side effects from her migraine medication, or medications not working (Tr. 258, 330, 348). Although treatment notes from May 2010, state that Plaintiff had not tried the new medication prescribed to her for migraines in April 2010 (Tr. 351) because she had not had a migraine that month, by August 2010, she reports discontinuation of the medication due to side effects from the medication, suggesting a continuation of Plaintiff's migraines. *See* Tr. 358. The ALJ's conclusion reached by focusing on a single treatment note from one month in which Plaintiff reported no migraine headaches, when, over the course of four years Plaintiff consistently reported and was treated for migraines and headaches is not supported by substantial evidence. Finally, this Court concludes that, as the Ninth Circuit found in *Vertigan v. Halter*, 260 F.3d 1044, 1050 (9th Cir. 2001), "activities such

as walking in the mall and swimming are not necessarily transferrable to the work setting" because a "patient may do these activities *despite* pain for therapeutic reasons, but that does not mean she could concentrate on work despite the pain or could engage in similar activity for a longer period given the pain involved." (emphasis in original). The ALJ's conclusion that Plaintiff's statement's concerning the intensity, persistence and limiting effects of her symptoms are not credible because the medical evidence of record establishes that Plaintiff has received only modest treatment for these alleged impairments is not supported by substantial evidence in the record. Further, the ALJ errs by citing to selective and limited treatment notes, in addition to taking statements in treatment notes out of context, to support the ALJ's conclusion of non-disability while ignoring the longitudinal treatment record in support of disability. *See* 12-2p ("For a person with [fibromyalgia], we will consider a longitudinal record whenever possible because the symptoms of [fibromyalgia] can wax and wane so that a person may have 'bad days and good days.'").

Commissioner asserts that "[i]t was reasonable for the ALJ to find that Plaintiff's alleged mental impairments did not significantly limit her ability to do basic work activities because Plaintiff herself did not appear to believe they were severe enough to require any treatment." (Doc. 37, at 8). Contrary to this assertion, however, Plaintiff was treated by Dr. Snider for depression, and reported complaints of anxiety, memory loss, feeling "icky in her head all day," "head fuzziness," and stress to Nance/Hoeft. Plaintiff reported that the study medication she was on helped with her "foggy days" but she was

not able to continue on the study medications. The ALJ erred by failing to consider the impact of Plaintiff's mental impairments on her ability to do basic work activities.

The ALJ found, in the category of ADL's, that Plaintiff had mild restrictions but was able to prepare breakfast, prepare her husband's lunch, do household chores, watch television, talk on the telephone, prepare dinner and wash dishes. Tr. 23. The ALJ also found that Plaintiff required no assistance in dressing or personal grooming. Tr. 23. From this, the ALJ inferred that Plaintiff had maintained a somewhat normal level of daily activity and interaction, and that the physical and mental requirements of these household tasks and social interactions are consistent with a significant degree of overall functioning. Tr. 23. The Ninth Circuit "has repeatedly asserted that the mere fact that a plaintiff has carried on certain daily activities ... does not in any way detract from her credibility as to her overall disability." *Vertigan,* 260 F.3d at 1050. One does not need to be 'utterly incapacitated' in order to be disabled." *Id.* (quoting *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989); *see Cooper v. Bowen*, 815 F.2d 557, 561 (9th Cir. 1987) (a claimant need not "vegetate in a dark room" to be eligible for benefits). The ALJ ignored Plaintiff's testimony that while she does make her husband lunch, she then goes "back to bed." Tr. 42. When she wakes up again, it takes her half an hour to get moving, she eats cereal, she may water her plants, then she sits down or lies down for a bit. Tr. 43. She may "try to do the dishes." Tr. 43. If she is feeling good, she may cook an evening meal. Tr. 43

An ALJ errs in discounting the credibility of a claimant where the ALJ relies largely on claimant's ability to carry out certain routine tasks, which were quite limited and carried out with difficulty. *Benecke,* 379 F.3d at 594. Daily activities may only form the basis of an adverse credibility finding if the claimant is able to spend "a substantial part of his day engaged in pursuits involving the performance of physical functions that are transferable to a work setting...." *Fair,* 885 F.2d at 603 (emphasis omitted).   "In evaluating whether the claimant satisfies the disability criteria, the Commissioner must evaluate the claimant's 'ability to work on a sustained basis.' " *Lester v. Chater,* 81 F.3d 821, 833 (9th Cir. 1995) (emphasis in original). "Occasional symptom-free periods--and even the sporadic ability to work--are not inconsistent with disability." *Id.*  Doing general household chores for limited intervals at sporadic frequency with periods of rest in between the periods of activity is not inconsistent with Plaintiff's claim of disability, and the ALJ failed to demonstrate how this testimony contradicted Plaintiff's claim. The ALJ erred in relying on Plaintiff's activities of daily living to conclude that Plaintiff is capable of the ability to work on a sustained basis.

### 3)  Dictionary of Occupational Titles

Given the Court's ruling on the issues above, the Court need not address Plaintiff's arguments that the Commissioner erred by finding that Plaintiff could perform her past relevant work as a hair stylist without benefit of vocational expert testimony and without reference to the Dictionary of Occupational Titles. (Doc. 24, at 19).

D. <u>Appropriate Remedy</u>

"Where the Commissioner fails to provide adequate reasons for rejecting the opinion of a treating or examining physician, we credit that opinion 'as a matter of law.'" *Lester,* 81 F.3d at 834 (quoting *Hammock v. Bowen*, 879 F.2d 498, 502 (9th Cir. 1989); *Benecke*, 379 F.3d at 594 ("Because the ALJ failed to provide legally sufficient reasons for rejecting Benecke's testimony and her treating physicians' opinions, we credit the evidence as true."). Accordingly, the Court credits Dr. Beck's opinion as true. The decision to remand for further development of the record or for an award benefits is within the discretion of the Court. 42 U.S.C. § 405(g); *see Harman v. Apfel*, 211 F.3d 1172, 1173-74 (9th Cir. 2000). This Circuit has held that evidence should be credited as true, and an action remanded for an award of benefits, where three conditions are met: the ALJ has failed to provide legally sufficient reasons for rejecting the evidence, no outstanding issue remains that must be resolved before a determination of disability can be made, and it is clear from the record that the ALJ would be required to find the claimant disabled were the rejected evidence credited as true. *See, e.g., Varney*, 859 F.2d at 1400.

Here, the ALJ erred by rejecting Dr. Beck's opinion in step two and consequently failed to incorporate Plaintiff's mental impairments at step four of the disability determination. He also failed to provide legally sufficient reasons for rejecting Plaintiff's subjective symptom testimony. However, it is not clear that the ALJ would be required to find Plaintiff disabled if such evidence were credited. By failing to establish Plaintiff's

nonexertional limitations caused by Plaintiff's cognitive deficiencies the ALJ concluded his analysis at step four and did not reach step five. As such, even if the evidence in the record mandated a finding that Plaintiff is not able to perform her past work, it is unclear whether there might be other jobs in the national economy that Plaintiff could perform. In cases where the testimony of a vocational expert has failed to address functional limitations as established by improperly discredited evidence, this Circuit "consistently [has] remanded for further proceedings rather than payment of benefits." *Harman*, 211 F.3d at 1180 (citation omitted). Thus, a remand for further proceedings is appropriate in this case. On remand the ALJ should properly evaluate Dr. Beck's opinion, Plaintiff's nonexertional limitations, Plaintiff's credibility, residual functional capacity, and obtain the testimony of a vocational expert.

Accordingly,

IT IS ORDERED:

1. The Commissioner's decision denying benefits is REVERSED and this matter is REMANDED for further proceedings consistent with this order.

2. The Clerk of the Court is instructed to enter judgment accordingly and close this case.

Dated this 27th day of August, 2013.

Bernardo P. Velasco
United States Magistrate Judge

- 29 -